## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1] | Case No. 17-12560 (JKS) |
| Remaining Debtors. | (Jointly Administered) |
| MICHAEL GOLDBERG, in his capacity as Liquidating Trustee of the WOODBRIDGE LIQUIDATION TRUST, | |
| Plaintiff, | Adversary Proceeding No. 19-50329 (JKS) |
| v. | |
| DENA FALKENSTEIN, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
## OR IN THE ALTERNATIVE SUMMARY ADJUDICATION

Jason S. Pomerantz (admitted *pro hac vice*)
Jeffrey P. Pomerantz (admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100

*Counsel for the Liquidating Trustee*

---

[1] The Remaining Debtors and the last four digits of their respective federal tax identification numbers are as follows: Woodbridge Group of Companies, LLC (3603) and Woodbridge Mortgage Investment Fund 1, LLC (0172). The Remaining Debtors' mailing address is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423.

# TABLE OF CONTENTS

I. NATURE AND STATUS OF PROCEEDING ..........................................................................1

II. SUMMARY OF ARGUMENT ........................................................................................2

III. STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................................4

    A.    The Chapter 11 Cases ...........................................................................................4

    B.    The Ponzi Scheme.................................................................................................5

           (i)    Overview of the Ponzi Scheme ................................................................5

           (ii)    Ponzi Scheme Findings by this Court and the District Court ....................8

    C.    Defendant's Receipt of Transfers in the Preference Period...................................9

    D.    Defendant's Receipt of Net Winner Transfers.....................................................10

    E.    Discovery in the Adversary Proceeding ..............................................................10

IV. ARGUMENT.......................................................................................................11

    A.    Summary Judgment Standard ..............................................................................11

    B.    First and Second Claims For Relief: The Preferential Transfers are
Avoidable and Recoverable .................................................................................12

           1.    The Motion Establishes a *Prima Facie* Case for Avoidance
Pursuant to 11 U.S.C. § 547...................................................................12

           (i)    The Transfers Were Property Of The Debtors..........................................12

           (ii)    The Transfers Were Made To Defendant, A Creditor Of The
Debtors...................................................................................................13

           (iii)    The Transfers Were Made On Account Of An Antecedent Debt..............13

           (iv)    The Debtors Were Insolvent At All Times During The Preference
Period And Have The Benefit Of The Statutory Presumption Of
Insolvency Under 11 U.S.C. § 547(f) ......................................................13

           (v)    The Transfers Occurred On Or Within 90 Days Of The Petition
Date .......................................................................................................14

           (vi)    The Transfers Enabled The Defendant To Receive More Than He
Would Have Received If The Transfers Had Not Been Made And
The Defendant Received Payment Of His Debt To The Extent
Provided By The Bankruptcy Code .........................................................14

           2.    The Defendant Has Failed to Show That There is A Genuine Issue
of Material Fact on Any Affirmative Defense ...........................................15

C.      Third and Fourth Claims for Relief:  The Transfers Were Actual Intent Fraudulent Transfers Under Section 548(a)(1)(A) of the Bankruptcy Code and California Civil Code § 3439.04(a)(1) ............................................................18

(1)      Defendant Received Transfers From The Debtors ...................................19

(2)      The Net Winner Transfers Were Made With Actual Intent To Hinder, Delay, Or Defraud Creditors..........................................................20

(iii)      Defendant Has No Defense Under Section 548(c) of the Bankruptcy Code or California Civil Code § 3439.08(a) .........................25

V. CONCLUSION ...................................................................................................27

# TABLE OF AUTHORITIES

## CASES

*Aghaian v. Minassian,*
59 Cal. App. 5th 447, 455 n.8 (2020) ........................................................... 20

*Allstate Ins. Co. v. Countrywide Fin. Corp.*
842 F. Supp. 2d 1216 (C.D. Cal. 2012) ........................................................ 23

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 248 (1986) ............................................................................ 11

*Arizona v. California,*
460 U.S. 605, 618 (1983) ............................................................................ 22

*Briden v. Foley*
776 F.2d 379 (1st Cir. 1985) ....................................................................... 14

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .................................................................................... 11

*Cf. Christianson v. Colt Indus. Operating Corp.,*
486 U.S. 800, 815–16 (1988) ...................................................................... 22

*Cf. Travelers Indem. Co. v. Bailey*
557 U.S. 137 (2009) .................................................................................... 22

*Corel Petroleum, Inc. v. Banque Paribas-London*
797 F.2d 1351(5th Cir. 1986) ..................................................................... 12

*Devex Corp. v. Gen. Motors Corp.,*
857 F.2d 197, 199 (3d Cir. 1988).................................................................. 22

*Diamond v. Gemmel Pharmacy Grp., Inc. (In re Inland Global Med. Grp.)*
2006 Bankr. LEXIS 1370(Bankr. C.D. Cal. Mar. 21, 2006) .......................... 18

*Filip v. Bucurencui*
129 Cal. App. 4th 825 (2005) ...................................................................... 23

*Fruehauf Trailer Corp. v. Gen. Bearing Corp. (In re Fruehauf Trailer Corp.)*
2008 WL 835693, *4 (Bankr. D. Del. Mar. 27, 2008)................................... 13

*Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.)*
819 F.2d 214 (9th Cir. 1987) ................................................................. 16, 17

*Hassett v. Altai, Inc. (In re CIS Corp.)*
214 B.R. 108 (S.D.N.Y. 1997)..................................................................... 16

*In re Acequia, Inc.*,
   34 F.3d 800 (9th Cir. 1994) ............................................................................ 19

*In re AFI Holding, Inc.*,
   525 F.3d 700, 704 (9th Cir. 2008) ................................................................... 22

*In re Bayou Grp., LLC*
   439 B.R. 284 (S.D.N.Y. 2010).................................................................... 20, 25

*In re Bennett Funding Grp. Inc.*
   253 B.R. 316 (Bankr. N.D.N.Y. 2000) ............................................................. 17

*In re Bernard L. Madoff Inv. Sec. LLC*
   2011 U.S. Dist. LEXIS 97647 (S.D.N.Y. Aug. 31, 2011) ................................. 20

*In re Brazier Forest Products, Inc.*
   921 F.2d 221 (9th Cir. 1990) ........................................................................... 16

*In re Brothers Gourmet Coffees, Inc.*
   271 B.R. 456 (Bankr. D. Del. 2002) ................................................................. 14

*In re Bullion Reserve of N. Am.*
   836 F.2d 1214 (9th Cir. 1988), *cert denied* 486 U.S. 1056,
   108 S. Ct. 2824, 100 L. Ed. 2d 925 (1988)................................................ 13, 17

*In re Castillo*,
   39 B.R. 45 (Bankr. D. Colo. 1984) ................................................................... 12

*In re Coco*
   67 B.R. 365 (Bankr. S.D.N.Y. 1986) ................................................................ 14

*In re Cohen*,
   199 B.R. 709, 716 (B.A.P. 9th Cir. 1996)................................................... 20, 26

*In re Contempri Homes*
   269 B.R. 124 (Bankr. M.D. Pa. 2001) .............................................................. 13

*In re DBSI, Inc.*
   477 B.R. 504 (Bankr. D. Del. 2012) ................................................................. 21

*In re EPD Inv. Co.*
   — F. 4th —, 2024 U.S. App LEXIS 21363 (9th Cir. Aug. 23, 2024) .............. 20

*In re Ezra*
   537 B.R. 924 (B.A.P. 9th Cir. 2015).................................................................. 23

*In re First Software Corp.*
   81 B.R.211 (Bankr. D. Mass. 1988) ................................................................. 16

*In re Garoian*
   2014 Bankr. LEXIS 5254 (Bankr. C.D. Cal. Oct. 7, 2014) .............................. 20

*In re Imperial Corp. of Am.*
   No. 92-1003-IEG (LSP), 1997 U.S. Dist. LEXIS 20943 (S.D. Cal. Aug. 12, 1997) ....... 25

*In re Keystone Foods, Inc.*
    145 B.R. 502 (Bankr. W.D. Pa. 1992) ............................................................... 15

*In re M&L Business Machine Co., Inc.*
    84 F.3d 1330 (10th Cir. 1996) ......................................................................... 16

*In re Manhattan Inv. Fund Ltd.*
    397 B.R. 1 (S.D.N.Y. 2007) .............................................................................. 21

*In re Pringle*
    495 B.R. 447 (B.A.P. 9th Cir. 2013) ............................................................... 23

*In re Radnor Holdings Corp.*
    06-2009 WL 2004226, *2 (Bankr. D. Del. July 9, 2009) ................................ 13

*In re Resyn Corp.*,
    945 F.2d 1279, 1281 (3d Cir. 1991) ................................................................ 22

*In re Slatkin*
    525 F.3d 805 (9th Cir. 2008) ...................................................................... 21, 22

*In re Taubman*
    160 B.R. 964 (Bankr. S.D. Ohio 1993) ........................................................... 17

*In re Tribune Co. Fraudulent Conveyance Litig.*
    No. 11-md-2296 (RJS), 2017 U.S. Dist. LEXIS 3039 (S.D.N.Y. 2017) .......................... 23

*In re Virginia-Carolina Fin. Corp.*
    954 F.2d 193 (4th Cir. 1992) ........................................................................... 15

*In re Woodbridge Grp. of Cos., LLC,*
    592 B.R. 761, 764 (Bankr. D. Del. 2018) .......................................................... 8

*J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*
    909 F.2d 1524 (3d Cir. 1990) ........................................................................... 16

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*
    712 F.3d 185 (5th Cir. 2013) ........................................................................... 14

*Lore v. Schwartzer (In re Welscorp, Inc.)*
    2023 Bankr. LEXIS 1643 (B.A.P. 9th Cir.) ....................................................... 21

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ......................................................................................... 11

*Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*
    926 F.2d 1248 (1st Cir. 1991) ......................................................................... 23

*Moran v. Goldfarb,*
    No. 09 Civ. 7667 (RJS), 2012 U.S. Dist. LEXIS 100491, at *11–12 (S.D.N.Y.
    July 16, 2012) .................................................................................................. 22

*Official Comm. of Unsecured Creditors v. Juniper Commc'ns, Inc. (In re Network Access
    Solutions Corp.),*
    320 B.R. 574 (Bankr. D. Del. 2005). ............................................................... 12

*Perkins v. Haines*
    661 F.3d 623 (11th Cir. 2011) ........................................................................ 21

*Savage & Assoc. v. Mandl (In re Teligent, Inc.)*
    380 B.R. 324 (Bankr. S.D.N.Y. 2008) ............................................................ 15

*Scharffenberger v. United Creditors Alliance (In re Allegheny Health)*
    292 B.R. 68 (Bankr. W.D. Pa. 2003) .............................................................. 15

*Schick v. Herskowitz (In re Schick)*
    234 B.R. 337 (Bankr. S.D.N.Y. 1999) ............................................................ 13

*Schneider v. Barnard*
    508 B.R. 533 (E.D.N.Y. 2014) ........................................................................ 25

*Scholes v. Lehman,*
    56 F.3d 750, 762–63 (7th Cir. 1995) .............................................................. 22

*Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Investments Assocs.)*
    48 F. 3d 470 (10th Cir. 1995) ......................................................................... 17

*U.S. ex rel. Anderson v. N. Telecom, Inc.,*
    52 F.3d 810 (9th Cir. 1995) ............................................................................ 11

*Union Bank v. Wolas*
    502 U.S. 151, 161 (1991) ................................................................................ 12

*United Student Aid Funds, Inc. v. Espinosa*
    559 U.S. 260 (2010) ........................................................................................ 21

*Warfield v. Byron*
    436 F.3d 551 (5th Cir. 2006) .......................................................................... 26

*Waslow v. The Interpublic Grp. Of Cos. (In re M Group, Inc.)*
    308 B.R. 697 (Bankr. D. Del. 2004) ........................................................ 13, 15

*Wiand v. Lee*
    753 F.3d 1194 (11th Cir. 2014) ................................................................. 14, 24

## STATUTES

11 U.S.C. § 101(54)(D) ......................................................................................... 19

11 U.S.C. § 544 ....................................................................................................... 1

11 U.S.C. § 544(b) ........................................................................................... 19, 22

11 U.S.C. § 547 .................................................................................................. 1, 12

11 U.S.C. § 547(4)(A) ........................................................................................... 14

11 U.S.C. § 547(b) ............................................................................................. 3, 12

11 U.S.C. § 547(b)(1) ............................................................................... 3, 13

11 U.S.C. § 547(b)(2) ............................................................................... 3, 13

11 U.S.C. § 547(b)(3) ............................................................................... 3, 14

11 U.S.C. § 547(b)(4) ................................................................................... 3

11 U.S.C. § 547(b)(5) ............................................................................... 3, 15

11 U.S.C. § 547(c) .......................................................................... 15, 16, 17

11 U.S.C. § 547(c)(1) .................................................................................. 18

11 U.S.C. § 547(c)(4) .................................................................................. 18

11 U.S.C. § 547(f) ................................................................................. 13, 14

11 U.S.C. § 547(g) ...................................................................................... 12

11 U.S.C. § 548 ................................................................... 1, 18, 19, 20

11 U.S.C. § 548(a)(1) ............................................................................. 18, 25

11 U.S.C. § 548(a)(1)(A) ................................................................. 19, 20, 22

11 U.S.C. § 548(c) ................................................................................. 25, 26

11 U.S.C. § 550 ............................................................................................. 1

3439.04(b) .................................................................................................. 23

Cal. Civ. Code § 3439(a)(1)(A) ................................................................. 20

Cal. Civ. Code § 3439.01(m) ..................................................................... 19

Cal. Civ. Code § 3439.04(a) ................................................................. 19, 22

Cal. Civ. Code § 3439.04(a)(1) ........................................................ 18, 20, 25

Cal. Civ. Code § 3439.04(b)(7) .................................................................. 24

Cal. Civ. Code § 3439.08(a) ....................................................................... 25

Cal. Civ. Code § 3439.09 ............................................................................ 19

Cal. Civ. Code § 3439.09(a) ....................................................................... 19

Cal. Civ. Code §§ 3439–3439.14 ............................................................... 19

## **RULES**

Fed. R. Civ. P. §56(a) ................................................................................. 11

Michael Goldberg, in his capacity as Liquidating Trustee ("Plaintiff" or the "Liquidating Trustee") of the Woodbridge Liquidation Trust (the "Liquidation Trust"), submits this memorandum of law in support of his motion for summary judgment (the "Motion").

## I. NATURE AND STATUS OF PROCEEDING

1. The Liquidating Trustee is the authorized representative of the Liquidation Trust and has the authority and right "to carry out and implement all applicable provisions of the Plan," and to act for the Liquidation Trust in exercising its "exclusive right, power, and interest . . . to institute, commence, file, pursue, [and] prosecute . . . all Liquidation Trust Actions." *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* (Bankr. D.I. 2397)[2] (the "Plan") §§ 5.4.5, 5.4.15.

2. The above-captioned adversary proceeding (the "Adversary Proceeding") is an action to avoid and recover payments made by the Debtors to defendant Dena Falkenstein (collectively "Defendant"). The Liquidating Trustee's First Claim for Relief seeks avoidance of a $190,000 transfer (the "Ninety Day Transfer") made in the ninety days preceding the Petition Date (as defined below), pursuant to Bankruptcy Code section 547. The Third Claim for Relief seeks avoidance of $3,536.12 of transfers (amounts Defendant received in excess of his original investment, referred to herein as "Net Winner Transfers") made in the two years preceding the Petition Date, pursuant to Bankruptcy Code section 544 and 548. The Second and Fourth Claims for Relief are correlative claims under section 550 for the recovery of the transfers sought to be avoided in the First and Third Claims for Relief, respectively.

3. On November 27, 2019, the Liquidating Trustee commenced this adversary proceeding by filing the *Complaint for Avoidance and Recovery of Preferential and Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544, 547, 548 & 550* (Adv. D.I. 1) (the "Complaint").

4. On October 4, 2019, Defendant filed her Answer to Complaint. (Adv. D.I. 4). Defendant was an investor who invested in various Woodbridge Notes and/or Units.

---

[2] Citations to "Bankr. D.I. __" refer to docket entries in the lead bankruptcy case, *In re Woodbridge Group of Companies, LLC*, No. 17-12560 (JKS). Citations to "Adv. D.I. __" refer to docket entries in the above-captioned adversary proceeding.

5. Fact discovery in this adversary proceeding closed on August 30, 2024. *See* Adv. D.I. 96 (Scheduling Order), ¶ 3. Discovery confirmed that there is no genuine issue of material fact as to any of the claims asserted in the Complaint, which are now ripe for summary judgment in the Liquidating Trustee's favor.

## II. <u>SUMMARY OF ARGUMENT</u>[3]

6. The Debtors, under the control of Robert Shapiro ("<u>Shapiro</u>"), operated a massive Ponzi scheme, raising more than $1 billion from thousands of investors nationwide. The Securities and Exchange Commission (the "<u>SEC</u>") conducted an extensive investigation that ultimately established the existence of a Ponzi scheme. Criminal charges were subsequently filed against Shapiro in federal district court. Shapiro entered a guilty plea and admitted to the fraudulent scheme. This Court found and determined (as part of a contested Plan confirmation process) that the Debtors were operated as a Ponzi scheme. It has thus been conclusively determined as a matter of law that the Debtors operated a Ponzi scheme between (at least) 2012 and 2017.

7. Defendant was an investor who invested in First Position Commercial Mortgages (the "<u>FPCM</u>") and recovered his principal investment in the 90 day period prior to the filing of the bankruptcy petition. In addition, during the two years preceding the Petition Date, Defendant recovered amounts in excess of his initial investment, the Net Winner Transfers (as more specifically defined below).

8. The purpose behind the preference statute is self-evident from its title: "preference" laws are designed to treat the unsecured creditors of a debtor equally, setting those creditors who received no payment at all in the 90 days before the petition date on equal footing with those "preferred" creditors who were fortunate enough to have received payment on debts during the same time period. This action is intended to recover monies that the Debtors transferred to Defendant on the eve of bankruptcy such that those sums can be shared equitably with other non-preferred investors.

---

[3] All facts referenced in this Summary of Argument are set forth in greater detail, with citations to the record, in Section III, *infra*.

9. There is no genuine dispute that the Liquidating Trustee is entitled to judgment on each claim asserted in the Complaint.

10. **First**, with respect to the preference claims (First and Second Claims for Relief), the Liquidating Trustee has satisfied each of the elements of his *prima facie* case against Defendant set forth in 11 U.S.C. § 547(b) as follows:

- The funds transferred to Defendant were property of the Debtors. The payments were drawn from the operating account of Debtor Woodbridge Mortgage Investment Fund 3A, LLC.

- The transfers at issue were to or for the benefit of Defendant. *See* 11 U.S.C. § 547(b)(1).

- The transfers at issue were made on account of antecedent debt(s) owed by the Debtors as the payments paid outstanding FPCM investments. *See id.* § 547(b)(2).

- Defendant has provided no evidence to rebut the statutory presumption that the Debtors were insolvent. The Liquidating Trustee is entitled to a presumption of insolvency under 11 U.S.C. § 547(f) and thus meets the requirements of 11 U.S.C. § 547(b)(3).

- The transfers at issue were made on or within 90 days of the Petition Date. *See id.* § 547(b)(4).

- As Defendant was an unsecured creditor of one or more of the Debtors, the transfers at issue enabled Defendant to receive more than he would have received through a hypothetical chapter 7 liquidation because the Debtors' other unsecured creditors will receive less than a 100% distribution. *See id.* § 547(b)(5).

11. As there is no genuine issue of material fact as to each element of the Liquidating Trustee's *prima facie* case, the transfers at issue are avoidable unless Defendant can meet his burden to establish an affirmative defense. As there is no genuine dispute that Defendant is unable to meet this burden, summary judgment for the Liquidating Trustee on the First and Second Claims For Relief should be granted as a matter of law.

12. **Second**, with respect to the actual intent fraudulent transfer claims (Third and Fourth Claims For Relief), it is settled law that the existence of a Ponzi scheme establishes actual intent to hinder, delay, or defraud creditors as a matter of law. This Court has already found that the Debtors were part of a massive Ponzi scheme. Defendant has not disputed and cannot dispute that the Net Winner Transfers to Defendant (i.e., fictitious profits) were made in

connection with the Ponzi scheme. While thousands of investors in the Debtors collectively lost hundreds of millions of dollars of principal, other customers, such as Defendant, benefitted from the receipt of fictitious profits that in reality consisted of money taken from other less fortunate investors. Defendant can assert no rights to these fictitious profits and summary judgment should thus be granted to return these amounts to the estate. The Liquidating Trustee is thus entitled to summary judgment on his claims that the fictitious profits are avoidable as actual intent fraudulent transfers under the Bankruptcy Code and state law.[4]

13. In short, the Liquidating Trustee asserts valid preference and fraudulent transfer claims to which Defendant has no defense. The Court should grant summary judgment in the Liquidating Trustee's favor on all Claims for Relief.[5]

14. This litigation has been ongoing since 2019. Fact discovery is closed. Defendant has had ample opportunity to dispute the facts supporting the Liquidating Trustee's claims. The Motion is ripe for determination. For these reasons, and as set forth more fully herein, summary judgment should be granted in favor of the Liquidating Trustee.

## III. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The Chapter 11 Cases

15. On December 4, 2017 (the "Initial Petition Date"), Woodbridge Group of Companies, LLC and certain of its affiliates commenced voluntary cases under chapter 11 of the Bankruptcy Code. Other Debtors also filed voluntary chapter 11 cases within the following four months (each such date, including the Initial Petition Date, a "Petition Date").

16. On January 23, 2018, the Court entered an order approving a joint resolution among the Debtors, the unsecured creditors' committee, two ad hoc committees, and the SEC, which, *inter alia*: (i) provided for the Debtors' board of managers to be replaced with a new,

---

[4] Although the Ponzi scheme presumption, standing alone, is sufficient to establish actual intent, the undisputed facts also establish a confluence of "badges of fraud"—an additional basis for Defendant's liability on the Liquidating Trustee's actual intent fraudulent transfer claims. *See* Part IV.D.2(b), *infra*.

[5] The Liquidating Trustee seeks prejudgment interest on the transfers. *Cf.* Compl., Prayer for Relief ¶ 5 (requesting prejudgment interest). The Liquidating Trustee suggests that the Court defer consideration of the prejudgment interest calculation until entry of a final judgment. In the event the Court desires supplemental briefing or evidence on the Liquidating Trustee's entitlement to prejudgment interest or the calculation thereof, the Liquidating Trustee will submit such briefing or evidence as requested by the Court.

independent board (the "New Board"); and (ii) authorized the New Board to select a new Chief Restructuring Officer or Chief Executive Officer. *See* Bankr. D.I. 357. Under the direction of the New Board and with the approval of this Court, the Debtors designated Bradley Sharp of Development Specialists, Inc. as their Chief Restructuring Officer. *See* Bankr. D.I. 512, 573.

17.     On August 22, 2018, the Debtors, under the direction of the New Board and independent management, filed the Plan and an accompanying disclosure statement. *See* Bankr. D.I. 2397 (Plan) & 2398 (the "Disclosure Statement"). The Plan provided for the liquidation of the Debtors and their assets, which consisted largely of: (i) 189 real properties; (ii) cash; and (iii) the "Liquidation Trust Actions" (as defined in the Plan). *See* Disclosure Statement at 6. The Plan also provided for the creation of a Liquidation Trust, the purpose of which is to, among other things, prosecute litigation and make distributions to legitimate creditors. *See generally* Plan § 5.4.4.

18.     On October 24, 2018, the Court held a contested confirmation hearing on the Plan. *See* Bankr. D.I. 2888 (hearing transcript). The Court took evidence submitted by the parties, including from the Debtors in the form of the declarations of Bradley Sharp, Chief Restructuring Officer of WGC Independent Manager LLC; Soneet R. Kapila, who was retained by the SEC to conduct a forensic accounting investigation of certain Woodbridge entities; and Frederick Chin, the Chief Executive Officer of WGC Independent Manager LLC (the sole manager of the Debtors). *See* Bankr. D.I. 2829, 2833, 2834. The Court also heard live testimony from Messrs. Sharp and Kapila, including cross-examination by counsel for creditors opposed to the Plan. *See* Bankr. D.I. 2888 at 32:1–55:9.

19.     On October 26, 2018, the Court entered an order confirming the Plan. *See* Bankr. D.I. 2903 (the "Confirmation Order").[6]

**B.     The Ponzi Scheme**

**(i)     Overview of the Ponzi Scheme**

---

[6] A copy of the Confirmation Order is attached to the concurrently-filed *Request for Judicial Notice* (the "RJN") as Exhibit A.

20.     From August 2012 through December 1, 2017, the Debtors raised more than $1 billion from over 10,000 unsuspecting investors nationwide by selling those investors two primary products, five-year "Units" and twelve- to eighteen-month "Notes." *See* Bankr. D.I. 2829 (Sharp Decl. ¶ 21).[7]  Repayment of both Units and Notes, the Debtors represented, would be based on the purported revenues the Debtors would receive from issuing short-term loans to unrelated third-party property owners. *Id.* ¶ 22.  As marketed by the prepetition Debtors, the Debtors would make short-term loans, between $1 million and $100 million, to bona-fide third-party borrowers at high rates of interest (approximately 11%–15%), secured by first-position mortgages on real properties owned by the borrowers. *Id.*  These loans to third parties would supposedly be provided at loan-to-value ratios of approximately 60%–70%. *Id.*  The result, according to the sales pitch, would be a robust, safe cash-flow stream that would provide revenues for the Debtors to repay the Units and the Notes. *Id.*

21.     In reality, there was no robust and safe cash-flow stream from third-party borrowers, as a very small fraction of investor money flowed from the Debtors to unrelated third parties. *Id.* ¶ 23.  Rather, Shapiro created disguised affiliates to which money was loaned, and which sometimes (but not always) purchased real estate assets with the funds. *Id.* ¶¶ 13, 23.  These "borrowers" did not even have bank accounts and had no ability to service the required interest payments on an ongoing basis. *Id.*  In addition, they had no ability to retire the debt when due, other than through the sale of the underlying property, which does not appear to have been contemplated and was not frequently effectuated. *Id.*

22.     With regard to sales of real property, the annual cash flow from such sales (which sales were not frequent) was just a small fraction of the amount of principal and interest paid to investors. *Id.* ¶ 24.  For example, in 2016—the last full calendar year before the Initial Petition Date—$138.2 million in principal and interest payments were made to investors, even though the net proceeds of real property sales were only $28.4 million. *Id.*  These figures demonstrate that

---

[7] The "Sharp Declaration" refers to the declaration of Bradley D. Sharp submitted in connection with Plan confirmation. *See* Bankr. Docket No. 2829.  Mr. Sharp has also submitted a supplemental declaration in connection with this Motion (the "<u>Supplemental Sharp Declaration</u>").  For convenience, a copy of the original Sharp Declaration is attached to the Supplemental Sharp Declaration.

property sales were "grossly insufficient" to cover payments of principal and interest, and there was no other material source of revenue to make such payments other than from the sale of additional Notes and Units. *Id.*

23.     Accordingly, instead of using legitimate business proceeds, the prepetition Debtors used funds received primarily from new investors to make payments to old investors. *Id.* ¶ 25.  Over the course of the scheme, the prepetition Debtors, which Shapiro controlled, paid hundreds of millions of dollars of "interest" and "principal" to existing investors, primarily from funds received from new investors.  *Id.*  Shapiro also caused the Debtors to use commingled investor money to pay approximately $80 million in commissions, primarily to sales agents who sold these fraudulent "investments."  *Id.*

24.     Moreover, investments were solicited, and payments of "interest" were made to existing investors, without regard to whether the real property supposedly underlying the investment realized value (or even existed).  *Id.* ¶ 26.  For example, on certain occasions, Shapiro issued Notes in respect of properties that the Debtors never actually acquired.  *Id.*  Nevertheless, investments were solicited from investors, and liens and security interests were purportedly granted to the Debtors, to secure "loans" relating to such properties.  *Id.*

25.     In late 2017, Shapiro's fraudulent scheme unraveled.  *Id.* ¶ 27.  As federal and state investigations intensified and unfavorable press reports began to emerge, the prepetition Debtors found it increasingly difficult to raise new capital from investors.  *Id.*  As noted above, the prepetition Debtors were reliant on funds from new investors to make the payments promised to existing Unitholders and Noteholders.  *Id.*  When new investment dried up, the inability to make required Notes and Units servicing payments became inevitable; indeed, the prepetition Debtors were unable to make the December 1, 2017 interest and principal payments due on the Notes, which quickly precipitated the filing of the initial Debtors' bankruptcy cases on the Initial Petition Date.  *Id.*

**(ii)     Ponzi Scheme Findings by this Court and the District Court**

26.     In its published opinion on Plan confirmation, this Court found that the
Chapter 11 Cases "arise out of a massive, multi-year fraudulent scheme perpetrated by Robert
Shapiro between (at least) 2012 and 2017." *See In re Woodbridge Grp. of Cos., LLC*, 592 B.R.
761, 764 (Bankr. D. Del. 2018). "As part of this fraud, through the Woodbridge entities, Shapiro
raised over one billion dollars from approximately 10,000 investors—as either Noteholder[s] or
Unitholders—and used approximately $368 million of new investor funds to pay existing
investors—a typical characteristic of Ponzi schemes." *Id.* at 765. The Court made numerous
detailed findings of fact and ultimately concluded "that the Debtors were operated as a Ponzi
scheme." *Id.* at 771.

27.     Moreover, in the Confirmation Order, the Court made specific factual findings
regarding the existence of the Ponzi scheme:

> The evidence demonstrates, and the Bankruptcy Court hereby
> finds, that (i) beginning no later than July 2012 through December
> l, 2017, Robert H. Shapiro used his web of more than 275 limited
> liability companies, including the Debtors, to conduct a massive
> Ponzi scheme raising more than $1.22 billion from over 8,400
> unsuspecting investors nationwide; (ii) the Ponzi scheme involved
> the payment of purported returns to existing investors from funds
> contributed by new investors; and (iii) the Ponzi scheme was
> discovered no later than December 2017.

(RJN, Ex. A., Confirmation Order ¶ NN).

28.     On October 15, 2019, Robert Shapiro's sentencing hearing (the "Sentencing
Hearing") took place in the matter captioned *United States of America v. Robert Shapiro*, Case
No. 19-cr-20178-CMA, in the United States District Court for the Southern District of Florida,
the Honorable Cecilia M. Altonaga presiding (the "District Court"). Shapiro spoke at the
Sentencing Hearing, referencing his guilty plea and expressing remorse for his role in the Ponzi
scheme. *See* Oct. 15, 2019 Hr'g Tr. ("Sent. Hrg. Tr.") (RJN, Ex. B) at 98:12–21. In his
stipulated factual proffer in connection with his plea agreement, Shapiro stipulated, *inter alia*,
that (i) "[c]ontrary to representations to investors, [his] real estate portfolio failed to generate
sufficient cash flow, so the Shapiro-controlled properties were unable to satisfy the loan
obligations and interest payments owed to Woodbridge and its investors; (ii) "[t]o make up for

the cash deficiency . . . he diverted recently collected investors' funds to pay purported profits to prior investors"; and (iii) "[a]s a result of this improper diversion, hundreds of millions of dollars invested by new investors were misused to pay false and misleading 'returns' to existing Woodbridge investors."  RJN, Ex. C (Stipulated Factual Proffer); *see also* RJN, Ex. D (Plea Agreement).

29.     Thomas P. Jeremiassen, a restructuring advisor retained by the Liquidating Trustee, testified at the Sentencing Hearing as an expert witness for the United States regarding the evidence unearthed in the investigation of the Debtors' operations and Shapiro's role in operating a Ponzi scheme.  The District Court concluded that Shapiro had engineered a Ponzi scheme:  "I think there was the objection to the reference to the Ponzi scheme.  There is clearly evidence supporting that what transpired is in the nature of a Ponzi scheme."  Sent. Hrg. Tr. at 61:3–6; *see also id.* at 25:18–26:1, 41:18–42:3.

**C.     Defendant's Receipt of Transfers in the Preference Period**

30.     On June 22, 2016, Defendant and the Debtor executed a promissory note wherein the Debtor, Woodbridge Mortgage Investment Fund 4, LLC, promised to pay Defendant interest on the principal investment of $190,000 at a rate of 5% for the first year and 9% thereafter. (the "Promissory Note").  *See* Troszak Decl., ¶ 9.

31.     The 90-day preference period in the Debtors' bankruptcy case runs from September 6, 2017, through and including December 4, 2017, (the "Preference Period"). Troszak Decl. ¶ 8.

32.     During the Preference Period, Debtor Woodbridge Mortgage Investment Fund 4, LLC made, and Defendant received, payments totaling $190,000 (the "Preferential Transfers" and, together with the Net Winner Transfers, the "Transfers"). Troszak Decl. ¶ 8.

33.     The Preferential Transfers were made via checks issued from the Debtor's bank account. Troszak, Decl. ¶ 8.

34.     The Preferential Transfers were payments to the Defendant in satisfaction of an antecedent debt.  Specifically, the Preferential Transfers satisfied obligations under the Promissory Note.  Troszak, Decl. ¶¶ 8, 9.

35. At the time the Preferential Transfers were made, the Defendant was a creditor of the Debtors. Troszak, Decl. ¶¶ 8, 9.

36. As evidenced by the schedules filed in this bankruptcy proceeding, the Debtors' liabilities exceeded their assets as of the Petition Date. *See* Bankr. D.I. 1278. The amount of unsecured claims in this case far exceeds the assets available to satisfy such claims. Accordingly, distributions to general unsecured creditors will be substantially less than 100%. Troszak Decl. ¶ 7.

37. There is no evidence to rebut the presumption of the Debtors' insolvency during the Preference Period. Pomerantz Decl. ¶ 5; RFA Response No. 6.

**D.     Defendant's Receipt of Net Winner Transfers**

38. Between July 2016 and the Petition Date, the Defendant received transfers that, in the aggregate, were $3,536.12 in excess of his original investment (*i.e.*, the Net Winner Transfers). Troszak Decl. ¶ 8; *see also* RFA Response No. 15 (as defined below).

**E.     Discovery in the Adversary Proceeding**

39. The Liquidating Trustee propounded written discovery on Defendant; Requests for Admission, Special Interrogatories and Request For Production Documents.[8] Defendant responded to Request for Admissions only and admitted various facts. See Defendant's Objections and Response To Plaintiff's Request For Admissions, Set One (hereinafter, the "RFA Response"), a copy of which is attached as Exhibit B to the Pomerantz Declaration. A meet and confer letter was issued thereafter seeking Defendant's compliance , a copy of which is attached as Exhibit C to the Pomerantz Declaration. Defendant did not provide responses to Special Interrogatories and Request For Production Documents. Pomerantz Decl. ⁋5.

40. Defendant admitted the following material facts: (i) Defendant received each of the Transfers identified in the Complaint, and each Transfer was made for his benefit, see RFA Response Nos. 1 & 3; (ii) each of the Preferential Transfers was a payment in satisfaction of an

---

[8] The discovery requests are attached as Exhibit A to the concurrently-filed Declaration of Jason Pomerantz (the "Pomerantz Decl.")

antecedent debt owed to Defendant by the Debtors, see id. at No. 2; and (iii) at the time the Preferential Transfers were made, the Defendant was a creditor of the Debtors, id. at No. 4. Moreover, Defendant admits that the Net Winner Transfers were received in excess of his original investment, id. at No. 15.

## IV. ARGUMENT

### A. Summary Judgment Standard

41.     Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *Id.*

42.     The movant "bears the initial responsibility of informing the . . . court of the basis for its motion" and identifying what "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party carries this burden, the "party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment is properly granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

43.     Summary judgment is "'not a disfavored procedural shortcut,' but [rather is] the 'principal tool by which factually insufficient claims or defenses can be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources.'" *U.S. ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995) (brackets omitted) (quoting *Celotex*, 477 U.S. at 323–24, 327).

44.     Here, the Liquidating Trustee seeks summary judgment on all claims for relief in order to close this litigation in an efficient and cost-effective manner.

## B.     First and Second Claims For Relief: The Preferential Transfers are Avoidable and Recoverable

### 1.     The Motion Establishes a *Prima Facie* Case for Avoidance Pursuant to 11 U.S.C. § 547

45.     The avoidance of a preferential transfer helps "facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally." *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991) (quoting H. R. Rep. No. 95-595, p. 179 (1977)). To be recoverable as a preferential transfer, a payment must satisfy all of the requirements of 11 U.S.C. § 547(b). Specifically, the debtor must have had an interest in the property transferred, and the transfer must have been:

> (1)     made to or for the benefit of a creditor;
> (2)     made for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3)     made while the debtor was insolvent;
> (4)     made on or within ninety (90) days before the date of filing of the petition; and
> (5)     enabled the benefited creditor to receive more than such creditor would have received had the case been a chapter 7 liquidation and the creditor not received the transfer.

11 U.S.C. § 547(b).

46.     The trustee or debtor in possession bears the burden of proving each of these elements by a preponderance of the evidence. 11 U.S.C. § 547(g); *Official Comm. of Unsecured Creditors v. Juniper Commc'ns, Inc. (In re Network Access Solutions Corp.)*, 320 B.R. 574, 576 (Bankr. D. Del. 2005).

### (i)     The Transfers Were Property Of The Debtors

47.     "For a preference to be voided under Section 547, it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished." *Corel Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1355-56 (5th Cir. 1986), *rev denied*, 801 F.2d 398 (5th Cir. 1986) (quoting *In re Castillo*, 39 B.R. 45, 46 (Bankr. D. Colo. 1984)). Money paid from a commingled bank account under the debtor's control is presumptively

property of the debtor. *In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1217 (9th Cir. 1988), *cert denied* 486 U.S. 1056, 108 S. Ct. 2824, 100 L. Ed. 2d 925 (1988); *In re Radnor Holdings Corp.,* 06-2009 WL 2004226, *2 (Bankr. D. Del. July 9, 2009) (citing *Schick v. Herskowitz (In re Schick)*, 234 B.R. 337, 343 (Bankr. S.D.N.Y. 1999)). In this case, the Preferential Transfers were transfers of the Debtors' property because they were drawn from the Debtor's operating account. *See* Troszak Decl. ¶ 8

### (ii) The Transfers Were Made To Defendant, A Creditor Of The Debtors

48. At the time each of the Preferential Transfers was made, Defendant was a creditor of the Debtors. See Pomerantz Decl., Ex. B, RFA Response No. 4. Defendant admits that the Preferential Transfer was made to him. *See id.* at No. 1.[9] The Preferential Transfers were thus made to the Defendant, a creditor of the Debtors, pursuant to 11 U.S.C. § 547(b)(1).

### (iii) The Transfers Were Made On Account Of An Antecedent Debt

49. A debt is antecedent if it is incurred prior to the transfer in question. *Fruehauf Trailer Corp. v. Gen. Bearing Corp. (In re Fruehauf Trailer Corp.)*, 2008 WL 835693, *4 (Bankr. D. Del. Mar. 27, 2008) (quoting *In re Contempri Homes*, 269 B.R. 124, 127 (Bankr. M.D. Pa. 2001)). The facts in this case establish that the Preferential Transfers were payments on an antecedent debt, as the payments were made pursuant to the Note. Defendant received the Preferential Transfers in satisfaction of or on account of a then-existing obligation or debt owed to him by the Debtors at the time the payments were made. *See* RFA Response No. 2. Thus, the Preferential Transfers were made on account of antecedent debt. 11 U.S.C. § 547(b)(2).

### (iv) The Debtors Were Insolvent At All Times During The Preference Period And Have The Benefit Of The Statutory Presumption Of Insolvency Under 11 U.S.C. § 547(f)

50. For purposes of the Liquidating Trustee's *prima facie* case, a debtor is presumed insolvent during the ninety (90) days preceding the filing of the petition. *See* 11 U.S.C. § 547(f); *Waslow v. The Interpublic Grp. Of Cos. (In re M Group, Inc.)*, 308 B.R. 697, 700 (Bankr. D. Del. 2004). A creditor's lack of knowledge of the debtor's insolvency is no defense. *See Briden*

---

[9] Defendant also admits that the Preferential Transfer was made for his benefit. *Id.* at No. 3.

*v. Foley*, 776 F.2d 379, 381, n. 3 (1st Cir. 1985) ("The requirement that the creditor have reasonable cause to believe that the debtor was insolvent at the time of the transfers was eliminated by Congress in the Bankruptcy Amendments and Federal Judgeship Act of 1984"); *In re Coco*, 67 B.R. 365, 371 (Bankr. S.D.N.Y. 1986). Because the debtor has the benefit of this presumption, "[t]he party seeking to rebut the presumption must introduce some evidence to show that the debtor was solvent at the time of the transfer." *In re Brothers Gourmet Coffees, Inc.*, 271 B.R. 456 (Bankr. D. Del. 2002). A party seeking to avoid a transfer may rest upon the presumption if the creditor fails to produce some evidence of solvency. *Id.* If the party seeking to rebut the presumption fails, there is no material issue as to the debtor's insolvency. *Id.*

51.     In the instant case, Defendant produced no documents to evidence the Debtor was solvent at the time of receipt of the Transfers.   Pomerantz Decl., ¶7.  Even without the benefit of the subsection 547(f) presumption of  insolvency, and the Defendant's failure to produce evidence to the contrary, insolvency is established as a matter of law because the Debtors were operated as part of Ponzi scheme. *See, e.g., Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013) ("[A] Ponzi scheme is, as a matter of law, insolvent from its inception." (citation omitted)); *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014) ("Since Ponzi schemes do not generate profits sufficient to provide their promised returns, but rather use investor money to pay returns, they are insolvent and become more insolvent with each investor payment.").  The Debtors' insolvency cannot be genuinely disputed and there is no issue as to the Liquidating Trustee's success on this element of its claim.  11 U.S.C. § 547(b)(3) is satisfied.

(v)     **The Transfers Occurred On Or Within 90 Days Of The Petition Date**

52.     The Preference Period in this matter is from September 6, 2017, through and including December 4, 2017.  The Preferential Transfers were made during the Preference Period.  Pomerantz Decl. ¶ 4,  RFA Response No. 1.  Section 547(b)(4)(A) is therefore satisfied.

(vi)     **The Transfers Enabled The Defendant To Receive More Than He Would Have Received If The Transfers Had Not Been Made And The Defendant Received Payment Of His Debt To The Extent Provided By The Bankruptcy Code**

53.     Whether a transfer meets the test of Section 547(b)(5) of the Bankruptcy Code requires the formulation of a hypothetical chapter 7 distribution of the debtor's estate as it existed on the bankruptcy petition date. *Savage & Assoc. v. Mandl (In re Teligent, Inc.)*, 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008).  Courts must determine whether the creditor obtained more pursuant to the transfer than the creditor would have received in a chapter 7 distribution without the transfer. 11 U.S.C. § 547(b)(5); *In re M Group, Inc.*, 308 B.R. 697, 700 (Bankr. Del. 2004).

54.     "Courts have consistently held that as long as the distribution in bankruptcy is less than 100 percent, any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made." *In re M Group, Inc.*, 308 B.R. at 700 (citing *Scharffenberger v. United Creditors Alliance (In re Allegheny Health)*, 292 B.R. 68, 78 (Bankr. W.D. Pa. 2003)); s*ee also In re Virginia-Carolina Fin. Corp.*, 954 F.2d 193, 198-99 (4th Cir. 1992); *accord In re Keystone Foods, Inc.*, 145 B.R. 502, 509 (Bankr. W.D. Pa. 1992).

55.     In the instant case, general unsecured creditors will receive substantially less than a 100% recovery.  Troszak Decl. ¶ 7.

56.     The Liquidating Trustee has accordingly met his burden of proving that the Preferential Transfers enabled Defendant to receive more than he would have received had the Debtors filed a chapter 7 case without having made the Preferential Transfers.

57.     In sum, the Troszak Declaration and Defendant's own admissions show there is no genuine issue as to any material fact with respect to the avoidability of the Preferential Transfers under Section 547(b). Accordingly, unless the Defendant is able to establish that there is a genuine issue of material fact as to an affirmative defense under Section 547(c), the Liquidating Trustee is entitled to summary judgment in his favor on the First and Second Claims for Relief.

**2.      The Defendant Has Failed to Show That There is A Genuine Issue of Material Fact on Any Affirmative Defense**

58.     The moving party on summary judgment has no burden to negate or disprove

matters for which the opponent has the burden of proof at trial.  Indeed, the moving party need

not produce any affirmative evidence at all on those matters.  *See In re Brazier Forest Products,*

*Inc.*, 921 F.2d 221, 223 (9th Cir. 1990). Defendant has the burden of proving any affirmative

defense by a preponderance of the evidence, and the Liquidating Trustee, as the moving party,

may simply point to the absence of evidence to make his case.  *See J.F. Feeser, Inc. v. Serv-A-*

*Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990); *Hassett v. Altai, Inc.* (*In re CIS Corp.*), 214

B.R. 108, 119 (S.D.N.Y. 1997).   In the present case, Plaintiff propounded discovery seeking the

documents to support the various affirmative defenses referenced by Defendant in the Answer to

the Complaint.  Pomerantz Decl. ¶ 7.  No documents were produced by the Defendant to support

their defenses pled.  id.  Moreover, "[b]ecause of the policy served by preference law, courts

have repeatedly held that the exceptions contained in 11 U.S.C. § 547(c), including the ordinary

course of business exception, 'should be narrowly construed.'" *In re CIS Corp.*, 214 B.R. at 119-

20 (quoting, *inter alia*, *In re First Software Corp.*, 81 B.R.211, 213 (Bankr. D. Mass. 1988)); *See*

*In re M&L Business Machine Co., Inc.*, 84 F.3d 1330, 1339 (10th Cir. 1996)

> **(a)     Defendant Does Not Qualify for the Ordinary Course of Business**
> **Defense Under 11 U.S.C. § 547(c)(2) Because the Transfers Were**
> **Made in Connection With A Ponzi Scheme**

59.     The ordinary course of business defense under 11 U.S.C. § 547(c)(2) is a defense

the Defendant would bear the burden to prove at trial by a preponderance of the evidence. 11

U.S.C. § 547(g).  The Liquidating Trustee anticipates that Defendant  may contend that since the

Preferential Transfers were returned in general compliance with the terms of the Promissory

Note, such payments are excepted from avoidance by the ordinary course of business defense.

The argument is flawed as a matter of law.

60.     By definition, debts incurred and transfers made in connection with a Ponzi

scheme are outside of the ordinary course of business.  *See Graulty v. Brooks (In re Bishop,*

*Baldwin, Rewald, Dillingham & Wong, Inc.)*, 819 F.2d 214, 216 (9th Cir. 1987).  In *Graulty*, the

court explained that Congress intended the ordinary course of business exception to apply only to

transfers by legitimate business enterprises.  To apply subsection 547(c)(2) to immunize these

activities "would lend judicial support to 'Ponzi' schemes by rewarding early investors at the expense of later victims." *Id.* at 217 (citation omitted). The ordinary business terms of investment companies do not include payments to early investors that are made possible only by the investments of later investors—the *sine qua non* of a Ponzi scheme.

61. Accordingly, numerous courts have held that the "ordinary course" exception does not apply to transfers made in connection with Ponzi schemes. *See Graulty*, 819 F.2d at 217; *In re Bullion Reserve of North America*, 836 F.2d 1214, 1219, n. 8 (9th Cir. 1988) ("Transfers made in a 'Ponzi' scheme are not made in the ordinary course of business."); *In re Taubman*, 160 B.R. 964, 991 (Bankr. S.D. Ohio 1993) ("Ponzi schemes are not legitimate businesses which Congress intended to protect by enactment of § 547(c)(2)."). Even those courts that have refused to adopt a bright-line test excluding the application of the ordinary course defense in all Ponzi scheme cases (reasoning that, for example, commercial vendors could engage in ordinary business dealings with a Ponzi scheme) have nonetheless held that the defense is not applicable when it involves distributions to ***investors*** in a Ponzi scheme, as in the present case. *See Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Investments Assocs.*), 48 F. 3d 470, 476 (10th Cir. 1995) ("Transfers made to noninvestor-creditors, in the ordinary course of business and according to ordinary business terms, may be protected from preference avoidance under § 547(c)(2). Because the $190,000 transfer to [defendant] was a transfer to an investor in a Ponzi scheme, however, that transfer was not made according to ordinary business terms and thus, cannot be defended under § 547(c)(2)."); *In re Bennett Funding Grp. Inc.*, 253 B.R. 316, 323 (Bankr. N.D.N.Y. 2000) ("The Court does not take issue with those courts that have concluded that Code § 547(c) is not a defense available to *investors* in a Ponzi scheme." (emphasis in original)).

62. As set forth above, this Court has already determined—and Defendant cannot genuinely dispute—that the Debtors operated a Ponzi scheme at all relevant times. The Preferential Transfers to Defendant were indisputably made in connection with that scheme. The ordinary course of business defense is not available as a matter of law.

        **(b)**     **Defendant Does Not Qualify For The New Value Defense Under 11 U.S.C. § 547(c)(4)**

63.     Bankruptcy Code subsection 547(c)(4), referenced as the "subsequent advance" exception to preference recovery, provides, in pertinent part, that the trustee may not avoid a transfer:

> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor –
>
> > (A) not secured by an otherwise unavoidable security interest; and
> >
> > (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor. [Emphasis added.]

64.     To prevail under the new value defense, a creditor must show: (1) that it gave unsecured new value to or for the benefit of the debtor; (2) after the preferential transfer; and (3) the debtor did not repay the new value by an otherwise unavoidable transfer. *Diamond v. Gemmel Pharmacy Grp., Inc. (In re Inland Global Med. Grp.)*, 2006 Bankr. LEXIS 1370, at *6 (Bankr. C.D. Cal. Mar. 21, 2006). The new value defense is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors. *Id.* Here, there was ***no*** new investment or other value provided subsequent to any of the Preferential Transfers (indeed, Defendant provided no subsequent investment or value after his original investment in 2016). Troszak Decl. ¶ 9. The Debtors' estate was in no way replenished following the Transfers. The subsequent new value defense is not applicable.[10]

**C.**     **Third and Fourth Claims for Relief: The Transfers Were Actual Intent Fraudulent Transfers Under Section 548(a)(1)(A) of the Bankruptcy Code and California Civil Code § 3439.04(a)(1)**

65.     Section 548 of the Bankruptcy Code provides, in relevant part, that the trustee may avoid a transfer of an interest of the debtor in property that was made within two years of

---

[10] Similarly, the Defendant admits the "contemporaneous exchange of new value" defense under subsection 547(c)(1) has no application here. Pomerantz Decl., §5, RFA Response No. 8.

the petition date with "actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A).

66. Section 544(b) of the Bankruptcy Code permits a bankruptcy trustee to avoid any transfer of a debtor's property that would be avoidable by an unsecured creditor under applicable state law. 11 U.S.C. § 544(b).[11] Here, the applicable state law is the California Uniform Voidable Transactions Act (the "CUVTA"), Cal. Civ. Code §§ 3439–3439.14. The actual intent fraudulent transfer provision of the CUVTA is substantively identical to its Bankruptcy Code analog. *See* Cal. Civ. Code § 3439.04(a) (allowing a transfer to be avoided when the debtor acted with "actual intent to hinder, delay, or defraud" any creditor). The CUVTA, however, provides for a four-year lookback period. *See* Cal. Civ. Code § 3439.09. Here, all of the Net Winner Transfers were made within the two-year period prior to the Petition Date. Accordingly, the relief sought is the same whether under section 548 or section 544(b): avoidance and recovery of the Net Winner Transfers.

67. Under both the Bankruptcy Code and the CUVTA, there is no genuine dispute that the Net Winner Transfers are avoidable and recoverable as actual intent fraudulent transfers.

### (1) Defendant Received Transfers From The Debtors

68. A "transfer" under the Bankruptcy Code is defined as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). California's definition of a "transfer" is nearly the same. *See* Cal. Civ. Code § 3439.01(m) (providing that a "transfer" is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money").

---

[11] The existence of one "triggering" creditor with an allowable claim of any amount will suffice for the purposes of section 544(b) of the Bankruptcy Code. *See In re Acequia, Inc.*, 34 F.3d 800, 809–10 (9th Cir. 1994). At least one "triggering" unsecured creditor exists here, thereby enabling the Liquidating Trustee to use California Civil Code §§ 3439.04(a) and 3439.09(a) to avoid and recover transfers made within four years of the Initial Petition Date. *See* RJN ¶ E (claim of California Franchise Tax Board (Claim No. 04635), asserting claim for unpaid taxes for each year from 2013 through 2017); *See* RJN ¶ F claim of Provident Trust Group, LLC, FBO James D Helgeson IRA (Claim No. 03764), asserting investor claim related to investment made on or about July 10, 2014).

69.     Here, the record establishes that the Net Winner Transfers to Defendant originated from the Debtors' bank account and were "transfers" of the Debtors' property. *See* Troszak Decl. ¶ 8.

### (2)    The Net Winner Transfers Were Made With Actual Intent To Hinder, Delay, Or Defraud Creditors

70.     The "actual intent" inquiry is the same under section 548(a)(1)(A) of the Bankruptcy Code and California Civil Code § 3439.04(a)(1). *See In re Cohen*, 199 B.R. 709, 716 (B.A.P. 9th Cir. 1996) ("Whether [the debtor's] purchases were actually fraudulent as having been made with actual intent either to hinder or to delay or to defraud creditors is the same under the Bankruptcy Code and UFTA.").[12] "Whether a conveyance is fraudulent under Section 548(a)(1)(A) is thus determined by reference to the intent of *the debtor-transferor* in making the transfer; 'the state of mind of the *transferee* is irrelevant.'" *In re Bernard L. Madoff Inv. Sec. LLC*, 2011 U.S. Dist. LEXIS 97647, at *12 (S.D.N.Y. Aug. 31, 2011) (quoting *In re Bayou Grp., LLC*, 439 B.R. 284, 304 (S.D.N.Y. 2010)); *see also In re Garoian*, 2014 Bankr. LEXIS 5254, at *70 (Bankr. C.D. Cal. Oct. 7, 2014) ("In a fraudulent transfer inquiry based on actual intent, the court should focus on the state of mind of the transferor."). "The focus in the inquiry into actual intent is on the state of mind of the debtor." *In re Cohen*, 199 B.R. at 716-17.

### (a)    The Ponzi Scheme Presumption Establishes Actual Intent As A Matter Of Law

71.     Courts have consistently held that actual intent to defraud is established as a matter of law once it is determined that a transfer was made in connection with a Ponzi scheme. *See, e.g.*, *In re EPD Inv. Co.*, — F. 4th —, 2024 U.S. App LEXIS 21363, at *16 (9th Cir. Aug. 23, 2024) (citation and internal quotation marks omitted) ("If the trustee proves that the debtor operated a Ponzi scheme, the trustee is entitled to the irrebuttable presumption that the debtor transferred money with actual fraudulent intent under section 548. Or, as we have repeatedly put it, the mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud.");

---

[12] In California, the CUVTA supersedes the Uniform Fraudulent Transfer Act (UFTA). The CUVTA applies to transfers made or obligations incurred after January 1, 2016. However, the case law under the UFTA has been consistently applied to the CUVTA. *See Aghaian v. Minassian*, 59 Cal. App. 5th 447, 455 n.8 (2020).

*Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011) ("With respect to Ponzi schemes, transfers made in furtherance of the scheme are presumed to have been made with the intent to defraud . . . ."); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 471 (Bankr. S.D.N.Y. 2015) ("Once it is determined that a Ponzi scheme exists, all transfers made in furtherance of that Ponzi scheme are presumed to have been made with fraudulent intent."); *In re DBSI, Inc.*, 477 B.R. 504, 510–11 (Bankr. D. Del. 2012) (noting the presumption that "all payments made by a debtor in furtherance of a Ponzi scheme are made with actual fraudulent intent"); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 7, 9–11 (S.D.N.Y. 2007) (stating that the existence of a Ponzi scheme "demonstrates 'actual intent' as a matter of law").

72. Once the existence of a Ponzi scheme is established, "payments received by the transferee that exceed his or her initial investment are deemed to be fraudulent transfers as a matter of law." *Lore v. Schwartzer (In re Welscorp, Inc.)*, 2023 Bankr. LEXIS 1643, at *17 (B.A.P. 9th Cir.) (citing *In re Slatkin*, 525 F.3d 805, 814 (9th Cir. 2008)). That is because the source of the so-called "profits" received by the transferee is "a theft by the debtor from other investors." *Slatkin*, 525 F.3d at 815. In a Ponzi scheme, "the fraud consists of transferring proceeds received from the new investors to the previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists." *Welscorp*, 2023 Bankr. LEXIS 1643, at *16.

73. It cannot be reasonably disputed that the Net Winner Transfers were made in furtherance of a Ponzi scheme. The Court, after weighing the evidence at a contested confirmation hearing, issued a published opinion concluding that at all relevant times, "the Debtors were operated as a Ponzi scheme." *Woodbridge*, 592 B.R. at 771. The Confirmation Order similarly included findings of fact and conclusions of law that the Debtors operated as a Ponzi scheme. *See* Confirmation Order ¶ NN. The Confirmation Order is a final, non-appealable order. Defendant received notice of the Plan and Disclosure Statement and the deadline to Object to Confirmation of the Plan and did not object. *See* Bankr. D.I. 2651. This Court's findings and conclusions are binding in this litigation. *See, e.g.*, *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 276 (2010) ("Where, as here, a party is notified of a

plan's contents and fails to object to confirmation of the plan before the time for appeal expires, that party has been afforded a full and fair opportunity to litigate, and the party's failure to avail itself of that opportunity will not justify" relief from the confirmation order); *cf. Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150 (2009) ("We hold that the . . . finality of the Bankruptcy Court's orders following the conclusion of direct review generally stands in the way of challenging the enforceability of the injunction.").[13]

74.     Moreover, the District Court at Shapiro's Sentencing Hearing issued findings consistent with the findings of this Court. *See* ¶ 29, *supra*. Shapiro himself pled guilty and acknowledged his role in the Ponzi scheme. *See* ¶ 28, *supra* (citing Sent. Hrg. Tr. (RJN Ex. B) at 98:12–21 and factual proffer in connection with guilty plea). Courts frequently find that a guilty plea or plea agreement establishes the existence of a Ponzi scheme.[14]

75.     Accordingly, there is no genuine dispute that the Debtors were operated as a Ponzi scheme and that the Net Winner Transfers paid to Defendant as a purported return on investment were made in connection with that scheme. *id. at* RFA Response No. 15. The Net Winner Transfers are avoidable pursuant to section 548(a)(1)(A) of the Bankruptcy Code and California Civil Code § 3439.04(a) (made applicable through Bankruptcy Code section 544(b)).

**(b)     The Undisputed "Badges of Fraud" Independently Establish Actual Intent To Defraud**

---

[13] *Cf. Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)) (explaining that under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"); *In re Resyn Corp.*, 945 F.2d 1279, 1281 (3d Cir. 1991) (quoting *Devex Corp. v. Gen. Motors Corp.*, 857 F.2d 197, 199 (3d Cir. 1988)) ("The doctrine of the law of the case dictates that 'when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation.'" ).

[14] *See, e.g.*, *In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir. 2008) (explaining that the defendant's "plea demonstrates the existence of fraudulent intent and a Ponzi scheme"); *Moran v. Goldfarb*, No. 09 Civ. 7667 (RJS), 2012 U.S. Dist. LEXIS 100491, at *11–12 (S.D.N.Y. July 16, 2012) (granting summary judgment for the plaintiff seeking to recoup fictitious profits from a Ponzi scheme based on the guilty plea of an investment advisor who "admitted under oath to running a Ponzi scheme"); *Scholes v. Lehman*, 56 F.3d 750, 762–63 (7th Cir. 1995) (affirming the district court's reliance on the perpetrator's guilty plea admitting that all money transferred to him came directly or indirectly from the defrauded creditors of the perpetrator's corporations). In *In re Slatkin*, for example, the Ninth Circuit specifically held that "a debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent" and "precludes relitigation of that issue." 525 F.3d 805, 814 (9th Cir. 2008).

76.     Although the Court need look no further than the Ponzi scheme presumption to conclude that actual intent exists as a matter of law, the overwhelming and indisputable evidence of "badges of fraud" also establishes actual intent to hinder, delay, or defraud creditors.

77.     It is well-settled that, "[b]ecause direct evidence of intent is rare, courts tend to infer the existence of an intentional fraudulent transfer from the circumstances surrounding the transfer." *In re Pringle*, 495 B.R. 447, 467 (B.A.P. 9th Cir. 2013); *accord In re Ezra*, 537 B.R. 924, 930 (B.A.P. 9th Cir. 2015) ("Because direct evidence regarding the debtor's fraudulent or obstructive intent rarely is available, courts typically infer the debtor's intent from the surrounding circumstances.").

78.     To facilitate this analysis, the CUVTA enumerates eleven non-exclusive "badges of fraud" for courts to consider in deciding whether the requisite intent existed. Cal. Civ. Code § 3439.04(b). "No single factor necessarily is determinative, and no minimum or maximum number of factors dictates a particular outcome." *Ezra*, 537 B.R. at 931. However, the presence of only one or two factors may be enough to support a finding of intentional fraud. *See Filip v. Bucurencui*, 129 Cal. App. 4th 825, 834 (2005) (concluding "[a] finding of actual intent was virtually compelled" despite argument that "only two factors are present"). The existence of several badges of fraud can "constitute conclusive evidence of an actual intent to defraud." *In re Tribune Co. Fraudulent Conveyance Litig.*, No. 11-md-2296 (RJS), 2017 U.S. Dist. LEXIS 3039, at *33 (S.D.N.Y. 2017) (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*, 926 F.2d 1248, 1254–55 (1st Cir. 1991)).

79.     The evidence adduced by the Liquidating Trustee and set forth herein, which has not been controverted by Defendant, establishes multiple badges of fraud, including the most significant badges: (1) the lack of consideration provided for the Transfers, (2) the Debtors' insolvency throughout the relevant time period, and (3) concealment of facts or assets. *See Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1224 (C.D. Cal. 2012) ("Though solvency and adequacy of consideration are only two of the eleven statutorily enumerated badges of fraud, they are among the most compelling; a transfer made by a solvent entity and for reasonably equivalent value would not normally be expected to disadvantage

creditors."); *see also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp. 3d 219, 241 (S.D.N.Y. 2021) (affirming a finding of fraudulent intent based on lack of consideration, insolvency, and concealment of facts).

80. ***Lack of Consideration.*** It cannot be disputed that the Debtors received no value for the Net Winner Transfers made to Defendant. Defendant admits Net Winner Transfers exceeded the amount he originally invested. Pomerantz Decl., RFA No. 15. Response Under no scenario can Defendant establish that the transfer of the Net Winner Transfers was anything other than an effort to make an illegitimate business appear legitimate by appearing to pay interest. This badge of fraud is established.

81. ***Insolvency.*** Nor can it be reasonably disputed that the Debtors were insolvent at the time each Transfer was made. The income derived from the Debtors' real estate business, i.e., the construction and sale of real properties, was "grossly insufficient" to permit the payment of principal and interest to the investors. *See* ¶ 22, *supra* (citing Sharp Decl. ¶ 24). For every year from 2013 to 2017, the income derived from the sales of real property was well short of the amount required to pay investors their principal and "profits." *See id.* There was no other material source to make payments to investors other than money solicited from new investors recruited by Defendant and other brokers. *See id.* (citing Sharp Decl. ¶ 25). The Debtors were clearly not able to pay their debts as they became due unless they brought in new investors to the fraudulent scheme. This is a hallmark of a Ponzi scheme, and it establishes insolvency as a matter of law. *Janvey*, 712 F.3d at 196 ("[A] Ponzi scheme is, as a matter of law, insolvent from its inception." (citation omitted)); *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014) ("Since Ponzi schemes do not generate profits sufficient to provide their promised returns, but rather use investor money to pay returns, they are insolvent and become more insolvent with each investor payment.").

82. ***Concealment of Assets.*** As set forth in detail in paragraphs 20-24, *supra*, it cannot reasonably be disputed that the Debtors "concealed assets." Cal. Civ. Code § 3439.04(b)(7). The Debtors' entire investment pitch rested on the false premise that the Debtors' assets consisted of loans made to bona fide third-party borrowers, which would

generate stable cash flow for the Debtors (and, in turn, their investors).  The Debtors concealed the truth about their assets and "operations" until the Ponzi scheme unraveled.  *See* ¶¶ 20-24, *supra.*

83.     In sum, independent of the Ponzi scheme presumption, the evidence indisputably establishes that the Debtors possessed the requisite intent to hinder, delay, or defraud creditors under both section 548(a)(1) of the Bankruptcy Code and California Civil Code § 3439.04(a)(1). The Liquidating Trustee is entitled to summary judgment on his Third and Fourth Claims for Relief.

**(iii)     Defendant Has No Defense Under Section 548(c) of the Bankruptcy Code or California Civil Code § 3439.08(a)**

84.     Section 548(c) of the Bankruptcy Code creates a defense for an initial transferee of a fraudulent transfer who takes the property in (1) good faith and (2) for value.  *See* 11 U.S.C. § 548(c) ("[A] transferee . . . of such a transfer . . . that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer . . . .").  The CUVTA includes an analogous defense. *See* Cal. Civ. Code § 3439.08(a) (providing a defense to transferees who took in good faith and for reasonably equivalent value).

85.     Defendant bears the burden of proof on this defense, and thus to defeat the avoidance of a transfer on summary judgment, Defendant must offer affirmative evidence sufficient to create a material issue of fact as to whether he took for value and in good faith.  *See In re Imperial Corp. of Am.*, No. 92-1003-IEG (LSP), 1997 U.S. Dist. LEXIS 20943, at *8 (S.D. Cal. Aug. 12, 1997) (internal quotation marks omitted) (holding, in a case involving a good-faith defense to a fraudulent transfer, that if the plaintiff-movant demonstrates there is no genuine issue of material fact, "the nonmoving [defendant] must designate specific facts showing there is a genuine issue for trial"); *see also Schneider v. Barnard*, 508 B.R. 533, 551 (E.D.N.Y. 2014) ("Because Bankruptcy Code § 548(c) is an affirmative defense, the transferee bears the burden of establishing all elements of the . . . defense."); *In re Bayou Grp., LLC*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) ("The good faith/value defense provided in Section 548(c) is an affirmative

defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense."); *In re Cohen*, 199 B.R. at 718 ("The issue of good faith under [the CUVTA] is a defensive matter as to which the defendants asserting the existence of good faith have the burden of proof.").

86.     Here, Defendant has not established any facts supporting either "good faith" or "value" was rendered in exchange for receiving the Net Winner Transfers.  Nor could Defendant possibly meet her burden, because, as a matter of law, "net winners" in Ponzi scheme do not provide value for their fictitious profits.  *See, e.g.*, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2016 Bankr. LEXIS 4686, at *34-35 (Bankr. S.D.N.Y. Apr. 25, 2016) (describing "the rule applied in all Ponzi scheme cases that the transferee—even the innocent transferee—does not pay value for his fictitious profits" and observing that "[t]he rule is based on the lack of any benefit to the debtor and the adverse impact that recognition of a different rule would have on other defrauded investors").  Because there is not any genuine issue of material fact as to whether Defendant provided value for the Net Winner Transfers, the Court need not consider whether Defendant was a "good faith" transferee.  *See* 11 U.S.C. 548(c) (providing that "for value" and "in good faith" is a conjunctive test); *see also, e.g.*, *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006) (holding that because the broker defendant could not have provided value, "[w]e need not draw a conclusion on good faith").  Defendant has no defense to the receipt of the Net Winner Transfers.

## V. **CONCLUSION**

For the foregoing reasons, the Liquidating Trustee respectfully requests that the Court grant the Motion, enter summary judgment in substantially the form attached hereto, and grant such other and further relief as the Court deems just and proper.

Dated: December 10, 2024      **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Colin R. Robinson*  _____
Jason S. Pomerantz (CA Bar No. 157216) (*pro hac vice*)
Jeffrey Pomerantz (CA Bar No. 158923) (*pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: jspomerantz@pszjlaw.com
       jPomerantz@pszjlaw.com
       crobinson@pszjlaw.com

*Counsel for The Liquidating Trustee*

4899-0615-3987.3 94811.003